1  MATTHEW DONALD UMHOFER (SBN 206607)
   matthew@umklaw.com
2  J. ANTHONY KING (SBN 297279)
   anthony@umklaw.com
3  DIANE H. BANG (SBN 271939)
   dbang@umklaw.com
4  **UMHOFER, MITCHELL & KING LLP**
   767 S. Alameda St., Suite 270
5  Los Angeles, CA 90021
   Telephone: (213) 394-7979
6  Facsimile: (213) 529-1027

7  Attorneys for Plaintiffs

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10

11 MATTHEW D. VAN STEENWYK,           Case No.:
   Individually, as Trustee and Beneficiary
12 of The Matthew Van Steenwyk GST     **VERIFIED COMPLAINT FOR**
   Trust and The Matthew Van Steenwyk  **DIRECT CLAIMS:**
13 Issue Trust, and as Co-Trustee of The
   Gretchen Marie Van Steenwyk-Marsh   1. **BREACH OF FIDUCIARY**
14 GST Trust and The Gretchen Marie Van    **DUTY BY CONTROLLING**
   Steenwyk-Marsh Issue Trust;            **SHAREHOLDER;**
15 GRETCHEN VAN STEENWYK-             2. **AIDING AND ABETTING**
   MARSH, individually                   **BREACH OF FIDUCIARY**
16                                        **DUTY;**
                      Plaintiffs,      3. **BREACH OF CONTRACT;**
17   v.                                   **AND**
                                       4. **PRODUCTION OF**
18 KEDRIN E. VAN STEENWYK,               **CORPORATE RECORDS.**
   Individually, as Successor Trustee of the
19 Donald H. Van Steenwyk and Elizabeth
   A. Van Steenwyk 1996 Revocable Trust  **JURY TRIAL DEMANDED**
20 and Survivor's Trust, and as Executor of
   the Estate of Elizabeth Van Steenwyk;
21 DANIEL CARTER, Individually;
   KIERAN DUGGAN, Individually;
22 PAMELA PIERCE, Individually;
   JOSEPH MCCOY, Individually; S.
23 WESTLEY SHEDD, Individually;
   STEPHEN ORR, Individually;
24 GORDON THOMSON, Individually;
   TRENTON THORNOCK, Individually;
25 ROBERT KERR, Individually;
   ADELAIDA CELLARS, INC., a
26 California corporation; APPLIED
   TECHNOLOGIES ASSOCIATES,
27 INC., a California corporation;
   SCIENTIFIC DRILLING
28 INTERNATIONAL, INC. a Texas
   corporation; and ATA RANCHES,
   INC., a Delaware corporation, and
   DOES 1-10, inclusive,

                      Defendants.

---

                     *COMPLAINT*

Plaintiffs Matthew Van Steenwyk, Individually, as Trustee and Beneficiary of The Matthew Van Steenwyk GST Trust and The Matthew Van Steenwyk Issue Trust ("Matthew's Trusts"), and as Co-Trustee of The Gretchen Marie Van Steenwyk-Marsh GST Trust and The Gretchen Marie Van Steenwyk – Marsh Issue Trust ("Gretchen's Trusts") (referred to collectively at times as "Plaintiffs' Trusts"), and Gretchen Van Steenwyk, individually and as Co-Trustee of Gretchen's Trusts, bring this action against Defendant Kedrin E. Van Steenwyk ("Kedrin") Individually, as Trustee and Successor Trustee of the Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust and Survivor's Trust, as Executor of the Estate of Elizabeth Van Steenwyk, and as owner of Class A shares in ATA and SDI for violations of breach of fiduciary duties owed by ATA's and SDI's controlling shareholders to Plaintiffs. Defendants Daniel Carter, Kieran Duggan, Pamela Pierce, Joseph McCoy, S. Westley Shedd, Stephen Orr, Gordon Thomson, Trenton Thornock, and Robert Kerr (Carter, Duggan, Pierce, McCoy, Shedd, Orr, Thomson, Thornock, and Kerr are collectively referred to herein as "D&O Defendants"), Plaintiffs also bring direct claims against the D&O Defendants, and Defendant Adelaida Cellars, Inc. ("Adelaida") for the aiding and abetting those breaches owed to Plaintiffs.

## **INTRODUCTION**

1.    Plaintiffs, as minority shareholders of ATA and SDI, bring this action to finally put an end to the self-dealing transactions imposed upon the companies by their controlling shareholder, Kedrin. Since 2013, the controlling shareholder of ATA and SDI—Elizabeth Van Steenwyk from 2013 to 2016 and Kedrin Van Steenwyk from 2016 to present—has used her control and domination over a rubber stamp board of directors to divert money from ATA/SDI's oil drilling business to subsidize Adelaida Cellars—a pet project winery owned by Elizabeth and Kedrin.

2.    Because Elizabeth and Kedrin controlled the Class A voting shares, they had the right to elect the directors who served on ATA/SDI's board. Unsurprisingly, Kedrin and Elizabeth elected themselves to the board of directors, but purposefully

*COMPLAINT*

excluded Plaintiffs from the boardroom so that they could divert ATA and SDI money and assets for the benefit of their winery without opposition.

3.      In late 2018, Plaintiffs discovered that two wine grape vineyards owned by ATA (Hilltop Ranch and Viking Ranch, collectively referred to as the "Ranches") were losing $2 million per year. Plaintiffs later discovered that the Ranches were bleeding money because, as Kedrin admitted, Adelaida was only paying ATA one-third of what it cost to farm the grapes. However, as ATA's former CFO conceded, the Ranches provided "no benefit to the oil business."

4.      The disparity in the ownership percentages between ATA/SDI and KMBG, LLC, the company that owns Adelaida, allows Kedrin to profit from diverting money from ATA and SDI, where she owns just over 26% of the shares, into KMBG/Adelaida's coffers, in which she owns over a 51% interest.

5.      Because the Board refused to stop Kedrin (or even conduct an investigation), Matthew Van Steenwyk was forced to file a shareholder derivative lawsuit, *Van Steenwyk v. Van Steenwyk et al.,* Case No. 2:20-cv-02375, (the "2020 Shareholder Litigation"), in the Central District of California on behalf of his and his sister Gretchen's trusts. The Fourth Amended Complaint, which describes these illicit transactions in detail, is available at ECF No. 179 and is incorporated by reference herein.

6.      In July 2024, a unanimous jury verdict found Kedrin Van Steenwyk, Elizabeth Van Steenwyk, Pamela Pierce, Phillip Gobe, Gene Durocher, Joseph McCoy, Philip Longorio, Daniel Carter, and Kieran Duggan liable to ATA and SDI for breaches of fiduciary duty. The jury also found Kedrin Van Steenwyk and Elizabeth Van Steenwyk liable to Plaintiffs for breaches of fiduciary duty, aided and abetted by Adelaida. The total amount of damages awarded to date is over $21 million. Still pending are a claim for violation of California Corporations Code section 1601, equitable claims, and claims for attorneys' fees, which could result in additional damages. A true and correct copy of the jury's verdict is attached hereto as Exhibit 1.

7.     Despite the jury's finding that Kedrin, Carter, Pierce, and Duggan diverted over $21 million from ATA and SDI, the current board of directors steadfastly refuses to remove these transgressors from their high-level positions at ATA, SDI, and ATA Ranches. Defendants, including General Counsel Daniel Carter, apparently do not even know what their fiduciary duties are or how they breached them.

8.     After the 2020 Shareholder Litigation was filed, Defendants continued the very conduct for which they were found liable.  Defendants did not put an end to either the 2017 Services Agreement or the current Grape Purchase Agreement that were the principle grift vehicles used by Kedrin to take money from ATA and SDI and redistribute it to Adelaida.  Not only have Defendants continued to permit Kedrin to use ATA and SDI assets to benefit her winery, Adelaida, but upon information and belief, they are now likely using company money to pay for high-priced attorneys to defend certain directors in their post-trial challenges of the jury's decision, and to pay for a bond to prevent collection of the judgment. Defendants' continued misconduct in the face of a jury verdict against them amounts to recklessness, oppression, fraud, and malice.

9.     In March 2023, Defendants attempted to engineer the sale of the Ranches, some of ATA's most valuable assets, so that the proceeds could be used to reimburse Kedrin and the other directors and officers for judgments awarded against them in the 2020 Shareholder Litigation. Defendants informed the minority shareholders of an ATA Board meeting the next day to enter into a letter of intent ("LOI") to sell the Ranches for $22,500,000 to Mount Paso, LLC ("Mount Paso"). This purchase price was significantly below the two appraisals that ATA had received within the past two years for the Ranches ($28 million and $27.5 to $35.2 million). Rather than acting in the best interest of all shareholders, as is required in their role as fiduciaries to all shareholders, Defendants attempted to impose this sale upon the minority shareholders, without any opportunity for other shareholders to voice their

*COMPLAINT*

opinions or oppose the transaction.

10.    Critically, ATA negotiated a concession with the potential buyer, Mount Paso, whereby ATAR would keep the current year's grape crop, **which ATA/ATAR would give to Adelaida for free** (based upon a 2021 revised agreement between ATAR and Adelaida, guaranteeing that ATAR would lose money). Upon information and belief, that grape crop Adelaida would receive for free was worth more than $2 million. The only beneficiaries of this concession are Adelaida, KMBG, and their majority owner, Kedrin—making this a clear-cut case of self-dealing. Unsurprisingly, Adelaida's general manager was the point person for these negotiations, even though Adelaida has no ownership of these properties.

11.    During the March 13, 2023, video conference, Defendants Pierce and Carter informed Matthew and Gretchen that the $21+ million in proceeds from the sale of the Ranches would not be distributed as a dividend to ATA's shareholders, as would be expected, but rather would be "reserved" for the 2020 Shareholder Litigation. However, ATA had no need to reserve money for the lawsuit because: (i) ATA has insurance policies to cover the defense and liability in the case, and (ii) ATA would not be paying out damages, but rather it would be receiving payments of damages from the defendants. Upon information and belief, Defendants were going to set aside the proceeds of the sale to indemnify Kedrin and the D&O Defendants for their prior self-dealing transgressions.

12.    Based upon Defendants Pierce's and Carter's admission that ATA intended to use the proceeds of the sales of the ranches for indemnification (and Kedrin's pattern of self-dealing) the recent retention of high-priced counsel for an appeal, and Defendants' flat refusal to affirm or deny whether they are indemnifying defendants or paying for their defense costs, Plaintiffs are informed and believe that ATA funds are being wrongfully set aside as a slush fund to defend and indemnify Kedrin and the directors and officers of ATA/SDI for the money they have to pay back to ATA, SDI, and Plaintiffs, even though they were the wrongdoers that caused

the harm to the companies that resulted in the 2020 Shareholder Litigation.

13.    Given the path and ongoing conduct benefiting Adelaida, the money being "reserved" for defense and indemnification, Defendants' false representations, and the history of self-dealing, it is evident that Kedrin and her co-defendants have once again created a scheme designed to take millions of dollars out of Plaintiffs' pockets and place them into Kedrin's coffers in direct violation of their fiduciary duties.

14.    In short, Plaintiffs' Trusts have once again been oppressed, and the fiduciary duties owed to them by Defendants have been breached repeatedly. The law requires that directors, officers, controlling shareholders, and attorneys of corporations protect the interests of minority shareholders. Here, ATA and SDI's directors, officers, controlling shareholders, and attorneys have breached their fiduciary duties by acting in one of two ways: 1) they actively engaged in, facilitated, participated in, aided and abetted those breaches of fiduciary duty and wrongful conduct; or 2) they looked the other way when Kedrin and those managers who were loyal to her imposed on ATA, SDI, and ATA Ranches multiple unconscionable arrangements benefitting Adelaida at the expense of the companies and minority shareholders. Defendants have acted clearly unreasonably under the circumstances described in this complaint, which were known to them at all relevant times, and have wholly abdicated their corporate responsibilities.

15.    Plaintiffs and their trusts seek monetary damages from the Director Defendants who breached their fiduciary duties and should now be held to account for the financial harm suffered by ATA, SDI, ATA Ranches, and their shareholders.

16.    Plaintiffs and their trusts also seek damage from, and to impose a constructive trust on, assets of Kedrin and Adelaida acquired with the money and property of ATA and SDI that has been wrongfully diverted to Adelaida, or its shareholder KMBG, and Kedrin.

17.    Plaintiffs, individually and on behalf of Plaintiffs' Trusts, seek direct damages that are unique to Plaintiffs' Trusts and not incidental to any injuries to ATA, SDI, and ATA Ranches, from January 2021 to the present. Kedrin, as the controlling shareholder, owes fiduciary duties to Matthew's Trusts and Gretchen's Trusts as minority shareholders. Kedrin breached those duties by arranging for ATA, SDI, and ATA Ranches to financially support Adelaida, a company in which Gretchen's Trusts own zero interest, and Matthew's Trusts only own a de minimis interest. Through this arrangement, and with the informed aiding and abetting of Adelaida, Kieran Duggan, and certain D&O Defendants, Kedrin paid herself distributions and/or constructive distributions from ATA, SDI, and ATA Ranches and prevented ATA and SDI from making distributions to its minority shareholders.

18.    For these reasons, discussed more fully herein, and for the further reason that Kedrin and a number of her fellow D&O Defendants are recidivists, Plaintiffs seek to enjoin Kedrin and D&O Defendants from continuing to manage ATA, SDI, and ATA Ranches in the manner inconsistent with or in violation of their fiduciary duties.

## JURISDICTION AND VENUE

19.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because complete diversity of citizenship exists between Plaintiffs, on the one hand, and Defendants, on the other hand, and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

20.    Venue is proper in this Court because each of the corporations involved in this case conducts substantial business operations in the Central District of California. The corporate offices of three of these corporations are located in the Central District of California.

## THE PARTIES

21.    Plaintiff Matthew D. Van Steenwyk is a citizen of the State of Nevada and is Trustee and beneficiary of The Matthew Van Steenwyk GST Trust and Trustee

and beneficiary of The Matthew Van Steenwyk Issue Trust ("Matthew's Trusts"). Matthew, through Matthew's Trusts, is the owner of 23.75% of the Class B shares of ATA and 22.3% of the Class B shares of SDI. Through Matthew's Trusts, Matthew has continuously owned ATA and SDI stock at all times relevant to the allegations of this Complaint, continues to be an ATA and SDI shareholder today, and intends to remain a shareholder. Matthew, through Matthew's Trusts, also owns an interest in KMBG of 0.16736%. Matthew is also Co-Trustee of Gretchen's Trusts with respect to the shares of ATA Class B stock owned by Gretchen's Trusts.

22.    Plaintiff Gretchen Van Steenwyk-Marsh is a citizen of the State of Nevada. At all times relevant to the allegations in this Complaint, Gretchen's Trusts owned 23.75% of the Class B shares in ATA and 22.6% of the Class B shares of SDI. Gretchen's Trusts collectively continue to be ATA and SDI shareholders and intend to remain ATA and SDI shareholders. Gretchen's Trusts do not own any interest in KMBG.

23.    Defendant ATA is a gas and oil drilling technology company that is owned by the four children of founder Donald Van Steenwyk—Matthew, Brett, Gretchen, and Defendant Kedrin. It is a corporation incorporated under the laws of the State of California and has its principal place of business in the State of California. ATA is engaged in the business of providing services and equipment to individuals and companies involved in oil and gas exploration. ATA has, historically, researched and developed tools and technologies for its own use and the use of its sister company, SDI. ATA is headquartered and conducts substantial operations in San Luis Obispo County, California. ATA, through its wholly-owned subsidiary ATA Ranches, also owns ranching properties in Paso Robles, California that exclusively provides grapes to Adelaida Cellars winery.

24.    Defendant Scientific Drilling International, Inc. ("SDI") is a corporation incorporated under the laws of the State of Texas. SDI is headquartered in Houston, Texas and conducts substantial operations in California. SDI is a closely held

corporation as defined by Texas Business Organizations Code § 21.563.

25.    Defendant ATA Ranches (a/k/a "ATAR") is a corporation incorporated under the laws of the State of Delaware. On information and belief, ATA Ranches' principal place of business is in the State of California, as all or almost all of its assets are located in Paso Robles, California, and all of its business is conducted there as well. ATA Ranches, the corporate entity formed in 2018, is a wholly-owned subsidiary of ATA. Although ATA Ranches is a separate corporate entity on paper, in reality, it does not maintain corporate formalities, such as holding regular meetings and keeping minutes of corporate meetings. In fact, the directors of ATA hold board meetings and vote on decisions regarding assets owned by ATA Ranches. On information and belief, ATA Ranches is the alter ego of ATA.

26.    Defendant Kedrin E. Van Steenwyk is a citizen of the State of South Carolina. Plaintiffs are informed, and on that basis alleges, that Kedrin is trustee of The Kedrin Van Steenwyk GST Trust and trustee and beneficiary of The Kedrin Van Steenwyk Issue Trust ("Kedrin's Trusts"). Kedrin, through her Trusts, is the owner of 23.75% of the Class B shares of ATA and SDI. Kedrin is the Executor for the Estate of Elizabeth Van Steenwyk, and she is also Trustee of the Survivor's Trust under the Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust, through which she has record title to 25,500/50,000 (51%) of the outstanding shares of ATA's Class A voting stock. Kedrin controls ATA, SDI, ATAR, KMBG, and Adelaida by reason of the following:

a.    Kedrin controls the majority of all issued and outstanding Class A voting shares in ATA and SDI;

b.    Kedrin is a director of ATA and SDI;

c.    Kedrin controls Adelaida through her control over its only shareholder, KMBG.

d.    Kedrin controls a majority interest in KMBG;

e.    Kedrin is the Managing Member of KMBG; and

8

*COMPLAINT*

f.      Kedrin is the chief executive officer and a director of Adelaida.

27.      Defendant Adelaida Cellars, Inc. is a winery located in Paso Robles, California, and managed by Defendants Kedrin, Carter, and Duggan. Adelaida is a corporation incorporated under the laws of the State of California. KMBG purchased 100% of the stock of Adelaida in January 2013 for substantially less than its market value, raising serious tax implications. Adelaida's principal place of business is in the Central District of California. Adelaida is owned by KMBG, LLC. KMBG also owns two ranch properties adjacent to the Ranches. Kedrin holds a majority interest in KBMG, while Matthew holds a fractional interest. Gretchen does not own any interest in KMBG.

28.      Defendant Daniel Carter is an individual residing in the State of Texas. At all times relevant, Defendant Carter served as Secretary and General Counsel for ATA and SDI. Defendant Carter also serves as a director and officer of ATA Ranches. Since approximately August 2016, Defendant Carter has also served as a director of Adelaida.

29.      Defendant Kieran Duggan is an individual residing in the State of Texas. Defendant Duggan is the CFO of ATA, SDI, and ATA Ranches. Defendant Duggan is also a director of ATA Ranches. In May 2018, Defendant Duggan was appointed a director of Adelaida.

30.      Defendant Pamela Pierce is an individual residing in the State of Texas. Defendant Pierce is a director of ATA and SDI. Defendant Pierce also served as a director and officer of ATA Ranches from approximately 2020 to 2022.

31.      Defendant Joseph McCoy is an individual residing in the State of Texas. Defendant McCoy served as a director of ATA and SDI from approximately 2011 to 2023.

32.      Defendant Stephen Orr is a director of ATA and SDI.

*COMPLAINT*

33.    Defendant S. Westley Shedd is an individual residing in the State of Texas. Defendant Shedd is currently the CEO of ATA and SDI, and as the CEO, holds a director position for both companies.

34.    Defendant Gordon Thomson is an individual residing in the State of Texas. Defendant Thomson is a director of ATA and SDI.

35.    Defendant Trenton Thornock is an individual residing in the State of Texas. Defendant Thornock was a director of ATA from approximately 2023-2024.

36.    Defendant Robert Kerr is an individual residing in the State of Texas. Defendant Kerr is a director of ATA.

37.    Interested non-party Brett H. Van Steenwyk is Trustee of the Brett H. Van Steenwyk Nonexempt Marital Trust under the Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust, which trust is the holder of record title to 24,500/50,000 (49%) of the outstanding shares of ATA Class A Voting Stock. Brett also owns 23.75% of the Class B shares in ATA. Brett also owns a less-than-majority interest in KMBG.

38.    In early 2023, Brett was forced to file a separate lawsuit against Kedrin and D&O Defendants, *Brett Van Steenwyk v. Kedrin Van Steenwyk et al.*, Case No. 23CVP-0068 (San Luis Obispo Cty. Feb. 16, 2023), because Defendants had used an artifice to improperly deny Brett the right to vote for independent directors of his choice, even though he held 49% of the voting rights, which was sufficient to elect at least two and potentially three independent directors.

39.    In committing the wrongful acts alleged herein, each of the Defendants has acted in concert and as part of an enterprise with each of the other Defendants, and has pursued, or joined in the pursuit of, a common course of conduct, and has acted in concert with and conspired with each of the other Defendants in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged which gives rise to their primary liability, the D&O Defendants are liable for aiding and abetting and/or assisting the other Defendants in breaching their respective duties.

*COMPLAINT*

40.     Plaintiffs are unaware of the true names or capacities of the defendants sued under the fictitious names Does 1 through 10. Plaintiffs will seek leave of Court to amend this Complaint to allege the names and capacities of the Does as soon as they are ascertained. Plaintiffs believe that each of these fictitiously named defendants is responsible in some manner for the acts or omissions alleged in this Complaint and that Plaintiffs' injuries and damages were proximately caused by the acts or omissions of these defendants.

41.     Plaintiffs are informed and believe that at all times material herein, each of the defendants was the agent, employee, co-conspirator, and/or partner of each of the remaining defendants, and was, in doing the things complained of herein, acting within the course and scope of said agency, employment, conspiracy, and/or partnership, and acting also with the full knowledge and/or subsequent ratification of his/her/its principals, employers, co-conspirators, and/or partners.

## STATEMENT OF FACTS

**A.     ATA and SDI's Shareholders and Shareholder Structure**

42.     ATA and SDI issued two classes of shares to its shareholders – Class A voting shares and Class B capital shares. Class A shares have voting rights to elect directors, whereas Class B shares do not have voting rights.

43.     The Donald H. Van Steenwyk and Elizabeth A. Van Steenwyk 1996 Revocable Trust (the "1996 Trust"), own 50,000 Class A shares, the only voting shares issued by ATA and SDI that can elect board members. Accordingly, the shareholder who controls the majority of the Class A shares controls who serves on the boards of ATA and SDI.

44.     The 1996 Trust contains four sub-trusts: the Survivor's Trust, the Nonexempt Family Trust, the Exempt Family Trust, and the Nonexempt Marital Trust. Kedrin is the Successor Trustee of the Survivor's Trust. Brett is the Successor Trustee of the Nonexempt Family Trust, the Exempt Family Trust, and the Nonexempt Marital Trust.

45.     In 2016, Kedrin was appointed Successor Trustee of the Survivor's Trust and took control over a majority of the Class A shares in ATA and SDI, becoming the controlling shareholder.

46.     As Successor Trustee of the Survivor's Trust, Kedrin holds 51% of the Class A voting shares of ATA and 67% of the Class A voting shares of SDI. Brett holds the remaining Class A voting shares.

47.     The Class B shareholders in ATA and SDI are Kedrin ("Kedrin's Trusts"), Matthew and Gretchen through Matthew's Trusts, Gretchen's Trusts, and Brett Van Steenwyk through his GST and Issue Trusts ("Brett's Trusts").

48.     Kedrin, through her GST and Issue Trusts, owns 237,500 shares of Class B stock in ATA and 222,666 shares of Class B stock in SDI.

49.     Plaintiff Matthew Van Steenwyk, through Matthew's Trusts, owns 237,500 shares of Class B stock in ATA and 223,353 shares of Class B stock in SDI, representing close to a 24% equity ownership in ATA and SDI, with no voting rights regarding directors or non-oilfield transactions.

50.     Plaintiff Gretchen Marie Van Steenwyk-Marsh, through Gretchen's Trusts, owns 237,500 shares of Class B stock in ATA and 226,149 shares of Class B stock in SDI, representing close to a 24% equity ownership interest in ATA and SDI, with no voting rights regarding directors or non-oilfield transactions.

51.     From 2013 to 2016, Elizabeth Van Steenwyk was the Trustee of the 1996 Trust, and as a result, owned all Class A voting shares in ATA and SDI, and 99% of the of KMBG, which owns Adelaida. She also voted to elect herself as a director of ATA and SDI.

52.     Based upon her medical records, Elizabeth began "to develop the rapid onset of . . . severe cognitive problems" in mid-March of 2016.

53.     In May 2016, two doctors wrote reports concluding, respectively, that: (1) Elizabeth's reported "problems currently deprive her of [ ] capacity"; and (2) Elizabeth is "no longer able to adequately monitor and control her finances . . .."

54.     Plaintiffs are informed and believe, and on that basis alleges, that Kedrin played an instrumental role in obtaining the two medical reports. Based on the conclusions expressed in the reports, Kedrin was appointed as the Successor Trustee of the 1996 Trust and as Elizabeth's attorney-in-fact through a power of attorney. As a result, Kedrin took over control of the majority of the Class A (voting) shares in ATA and SDI, becoming the majority shareholder. Kedrin also assumed control over a substantial majority membership interest in KMBG and Adelaida and took over as Adelaida's CEO. Meanwhile, Elizabeth was admitted into a memory care facility.

**B.    Separation of Ownership of ATA and Adelaida**

55.     Prior to 2013, ATA owned Adelaida. However, in late 2012, Elizabeth directed ATA to sell the winery to KMBG—which she owned 99% of—in a transaction titled decidedly in her favor. ATA sold its stock in Adelaida to KMBG for $3,100,000, an amount substantially less than Adelaida's fair market value. No cash down payment was made by KMBG; rather, the entire purchase price was in the form of a promissory note from KMBG to ATA, which was to be repaid in installments (the "2013 Promissory Note"). Incredibly, the promissory note's interest rate was less than 1% per annum. The details and terms of the sale were not shared by the directors with Matthew and Gretchen at the time of the sale.

56.     Although Adelaida needed the grapes grown on HMR Ranch and Viking Ranch for its wines, KMBG did not purchase the Ranches. As a result, KMBG emerged from the deal with the potential revenue generating side of Adelaida's wine-making business, without being encumbered by the expensive cost side of the business, which included the planting, raising, harvesting, and shipping of wine grapes. Those costs remained with ATA.

57.     Adelaida's change of ownership following its stock sale in 2013 meant that there was an inherent conflict of interest in all transactions between ATA and Adelaida from 2013 onwards due to the disparity in ownership of ATA and Adelaida. While Elizabeth only owned a small percentage of ATA, she owned nearly all of

KMBG. Thus, the Board should have ensured that these transactions were at arm's-length and for fair value to protect ATA's minority shareholders.

58.    However, the Board instead rubber stamped the transactions between ATA/SDI and Adelaida without ever ensuring the agreements were at arm's length and fair to all shareholders. Following the sale of Adelaida, ATA absorbed all of the losses associated with operating the Ranches but was prevented from sharing in any potential financial upside from the sale of Adelaida's premium wine. Since 2013, ATA:

a.    Assumed all costs of operating the Ranches on which premium wine grapes used by Adelaida to make its wine are grown. The Ranches experienced financial losses through the practice of forcing ATA to sell its premium wine grapes to Adelaida at a fraction of their market value. Beginning in November 2016, the grapes were sold to Adelaida pursuant to a contract obtained through continuous fiduciary duty breaches by Defendant Kedrin and other defendants who aided and abetted her breaches. In fact, Kedrin admitted in a February 23, 2018, email that "what we pay ATA for grapes is not what it costs the ranches to farm them… probably about a third of their true costs. If we had to really pay for all our farming, our wines would have to be a lot more expensive to just break even." A true and correct copy of this email is attached hereto as Exhibit 2.

b.    Accepted late payments for the grapes it was forced to sell to Adelaida or accepted the practice of paying a separate entity for the grapes. In addition to the below market payments, Adelaida also directed payments for grapes to another entity, Stoneway Properties ("Stoneway"). Stoneway was and is controlled by the parties who abused their power over ATA to bring about this one-sided grape purchase arrangement.

c.    Subsidized substantially all of Adelaida's costs of doing business, including paying for virtually all of Adelaida's employee, accounting, and legal costs,

*COMPLAINT*

extending credit to Adelaida and its affiliates at zero or below-market interest rates, and paying for and/or advancing the costs of Adelaida's capital improvement projects.

59.    The financial effect of the sale of Adelaida on the controlling and minority shareholders was not inconsequential. The difference between Matthew and Gretchen's ownership percentages of ATA (about 23% each) compared to KMBG (near zero) had the financial effect of the controlling shareholder profiting at the expense of minority shareholders. By diverting money from ATA into KMBG/Adelaida's coffers, she has been able to profit (in the form of constructive dividends). For every dollar that ATA sends to KMBG/Adelaida or spends for their benefit, Kedrin only pays 26 cents, but she receives over 51 cents in cash or benefits.

60.    ATA's forced ownership of HMR Ranch and Viking Ranch has caused ATA and its minority shareholders damages.

61.    At trial, Defendants tried to explain away the massive losses that the Ranches were forced to incur as "an investment in the ranch property which increased the value of the land." However, this excuse rings hollow for several reasons. First, the vast majority of the losses were due to farming costs greatly exceeding the grape revenue due to the artificially low prices ATA was charging Adelaida.  These losses were thus completely unnecessary and avoidable, as ATA could have easily charged a fair market price for the grapes and not lost millions of dollars. However, Kedrin and Defendants made sure that did not happen.

62.    Second, much of the small amount of capital expenditures ATA made were to add additional vines and replant purportedly low producing vines for the benefit of Adelaida. These expenditures did not materially increase the value of the property, but rather magnified the losses due to ATA's negative margin on the grapes it grew and sold. More vines simply meant larger losses for ATA.

63.    Third, as is widely known, real estate prices are driven by the supply and demand in the market. Defendants, however, have attempted to take credit for a fortuitous rise in the West Paso Robles real estate market.  Defendants have not,

because they cannot, provided any evidence that anything that they did caused any purported appreciation in the property value. If anything, the immense annual losses and negative cashflow ATA suffered on its ranching operations create an economic record that makes the properties unattractive to a potential purchaser and lowers their valuation.

64.    Fourth, even if there was any appreciation due to the minimal capital improvements made on the properties, ATA's losses on the Ranches has dwarfed it. In 2018, Kedrin had ATA write off over $13 million in cash that ATA had lent the Ranches. The Ranches then burned through over $2 million more of ATA's cash since 2018. Thus, even if the Ranches fetched $22 million in a sale, ATA would net out only $7 million (and likely much less) in the transaction—which is $5 million less than the $12 million the Ranches were appraised at in 2018. In other words, ATA would have been much better off selling the Ranches years ago instead of wasting tens of millions of dollars on Ranches that only benefited Adelaida.

65.    Lastly, Defendants have attempted to falsely claim that the massive amounts of money being spent to grow and pick grapes was really a sophisticated development plan for the Ranches.  It was not. As Defendant Carter admitted at trial, the directors and officers "tried to spend as little time dealing with them as we could."

66.    Unsurprisingly, the jury saw through all of these manufactured justifications and backfill for their self-dealing and found that all defendants, including Kedrin, Elizabeth, Carter, Pierce, and Duggan had breached their fiduciary duties.

## C.    Defendants' Breach of Fiduciary Duties in Permitting Subsidies to Adelaida

67.    Kedrin continues to use her powers as director of ATA and SDI, as well as the powers she obtained under the power of attorney over Elizabeth and as successor trustee of the 1996 Trust, which gave her power over the majority of Class A voting shares in ATA and SDI, to engage in acts of self-dealing at the expense and

to the detriment of ATA, SDI, ATA Ranches, and their minority shareholders, including Plaintiffs' Trusts.

68.    Because Kedrin is an owner of and controls ATA and SDI, each transaction she arranges and/or directs wherein ATA and SDI are forced to subsidize and financially support Adelaida amounts to the transfer of value from one company she controls (ATA and/or SDI) to another company she also controls and will someday own outright (KMBG/Adelaida).

69.    On the other hand, Plaintiffs' Trusts suffer all of the economic pain and enjoy none of the economic gain from the subsidization of Adelaida. Kedrin acknowledged this in an email dated September 26, 2017, stating that "when it's someone else's money, i.e. KMBG or ATA, it is easier to just 'let it go'. [W]hen it's our own money, it hurts more. [I]t hurts me a lot!!!!"

70.    Kedrin directed and/or authorized, and D&O Defendants approved and/or ratified, the transactions between ATA and Adelaida described in this complaint. Those transactions benefitted Adelaida and Kedrin, and damaged ATA, SDI, ATA Ranches, and their minority shareholders, including Plaintiffs' Trusts. Kedrin testified during the 2020 Shareholder Litigation that she had to continue Elizabeth's project of developing the winery, otherwise Plaintiffs would sue her for neglect.

71.    During trial in the 2020 Shareholder Litigation, Defendant Duggan confirmed that intercompany debt between ATA and Adelaida/KMBG was written off by ATA more than once.

72.    Continuing a tradition started by Elizabeth at around the time of the non-arm's length sale of Adelaida to KMBG in 2013, ATA and SDI entered into an Agreements for Services with Adelaida and KMBG. Pursuant to the Agreements for Services, ATA and SDI have paid for, covered, and/or subsidized Adelaida's business overhead and operating expenses.

73.    Plaintiffs are informed and believe and, on that basis, allege that the services ATA and SDI provided, and continues to provide, to Adelaida under the

Agreement for Services are worth far more than the flat monthly fees called for in each of them. For example, the services ATA and SDI provided to Adelaida under the 2017 Agreement for Services include preparation of Adelaida's monthly financial statements and income tax returns, legal consultations, human resource inspections and training, construction and maintenance support, repairs of technology and computer IT support, and other services that have yet to be identified. Trial testimony by an Adelaida employee confirmed that the 2017 Agreement for Services is still in effect today, despite its inherent unfairness to ATA and SDI.

74. As alleged above, ATA has, since 2013, continued to pay all of the costs of owning and operating the two wine grape properties, HMR Ranch and Viking Ranch, incurring significant losses in the process of subsidizing Adelaida and its owners. Plaintiffs are informed and believe and, on that basis, alleges that ATA is also paying for the operating expenses of the ranches owned by KMBG, Par and Hilltop.

**D.    Defendants Breach Fiduciary Duties by Permitting Kedrin to Treat ATA's and ATA Ranches' Properties as Her Own**

75. ATA has sustained significant financial losses as a result of Defendants' spending spree on the ranching operations for the benefit of Adelaida. The losses incurred by ATA's ranching/wine grape operations resulted in a corresponding benefit to Kedrin and/or Adelaida. Financial statements show that ATA lost $1,315,451 in 2017, $1,367,571 in 2018, $1,631,701 in 2019, and $1,633,864 in 2020 in the ranching and grape growing operations. In fact, company financials show that the ranching operations have never been a viable operation on their own. These loss figures do not include all of the expenses ATA and SDI were directed to incur and did incur for the benefit of Adelaida.

76. While ATA was only receiving less than half of market value prices for its premium grapes, it was also being directed by Adelaida to engage in costly farming practices and make capital expenditures sheerly for the benefit of Adelaida but receiving no additional money from Adelaida to pay for these significant costs. As a

result, ATA suffered annual losses of $1.5 million on average just in operating the Ranches.

77.   In mid-2018, ATA Ranches, Inc. was created without Plaintiffs' knowledge as a wholly-owned subsidiary of ATA.

78.   In November 2018, the Ranches owned by ATA were transferred to ATA Ranches for no consideration, along with other assets totaling over $5.5 million. Over $13 million worth of expenses that the Ranches had accumulated over the years was zeroed out. And ATA's directors and officers, some of whom are named in this complaint, authorized a cash contribution of $2 million to the subsidiary company. The transfer of assets and $2 million contribution provided no benefit to ATA, SDI, Matthew, or Gretchen, and was only for the benefit of Kedrin and Adelaida.

79.   On June 23, 2021, Defendant Pierce called a special meeting of ATA and SDI directors to discuss the dire financial condition of ATA Ranches. At Kedrin's direction, ATA Ranches had already blown through the $2 million contribution just two years earlier and would be insolvent in a matter of days. Board materials prepared for the special meeting state the following:

> a.   the average annual operating expenses for ATA Ranches are $2,200,000-$2,400,000; and

> b.   ATA Ranches is projected to run out of cash by the end of June 2021.

80.   On June 25, 2021, Matthew, Gretchen, and Brett—constituting 70% of the economic interest of the companies—submitted a letter to the directors of ATA and SDI stating the following:

> a.   if ATA Ranches is really out of money, the board should explore selling the Ranches;

> b.   that the three siblings "stand ready to fund the shortfall of funding in ATA Ranches" if they placed the management of the Ranches

under a new independent board "with knowledgeable, experienced and unconflicted directors."

81.    At the Special Board of Directors Meeting held on June 28, 2021, ATA's and SDI's directors, where Defendants Kedrin, Carter, Duggan, Pierce, McCoy, Shedd, and Thomson were present, Defendants acknowledged receipt of the June 25 letter but otherwise ignored the siblings' proposal. The Board then proceeded to approve a new agreement for the provision of grapes to Adelaida, as follows:

    a.    in exchange for Adelaida agreeing to reimburse ATA Ranches for the farming costs ATA Ranches incurred, Adelaida would own all of the Ranches' grapes and walnuts, which constitute ATA Ranches' sole source of income;

    b.    ATA Ranches would continue to front all costs of farming the Ranches even though it no longer held any income-producing goods; and

    c.    ATA would continue to fund ATA Ranches' capital expenditures and pay property taxes and insurance;

    d.    Adelaida would not pay even a penny of rent for use of the land and vines owned by ATA Ranches.

82.    The Board's decision to approve the new agreement essentially gave Adelaida a deal that no other winery could possibly obtain—ownership of premium wine grapes that produced elite wines (rated 95 points and above) for merely what it costs to farm the grapes. Conversely, because ATA no longer had any income (because it was giving grapes away to Adelaida), it was guaranteed to lose money every year, as it incurred costs that were not being reimbursed by Adelaida, such as capital expenditures and the carrying costs of the property (e.g., taxes and insurance).

83.    For the years 2022 and 2023, Defendants Kedrin, Carter, Duggan, Pierce, McCoy, Shedd, Orr, Thomson, and Adelaida caused ATA Ranches to enter into an agreement with Adelaida specifying the viticultural practices and the production of

wine grapes. ATA Ranches agreed to grow certain grape varietals while Adelaida agreed to pay for certain costs associated with farming. Per the agreements, ATA Ranches paid for farming costs out of pocket, and Adelaida was required to pay a fixed amount each month to reimburse ATA Ranches with a true-up at the end of the year of any balance owed to ATA Ranches.

84.    The 2022 and 2023 viticultural agreements between ATA Ranches and ATA do not require Adelaida to pay for property taxes, insurance, or other capital expenditures. Adelaida also did not pay rent for use of the Ranches or its premium wine grape vines. In fact, Adelaida did not pay anything for the grapes themselves; Adelaida merely reimbursed ATA Ranches for money fronted by ATA for farming costs.

85.    ATA Ranches did not receive any income or profit from providing Adelaida with the entirety of its 2022 and 2023 grape crops. Upon information and belief, ATA and Adelaida entered into a similar viticultural agreement for 2024's grape harvest.

86.    The grape purchase arrangements that Defendants have manufactured and foisted upon ATA Ranches are so farcical and egregiously slanted against ATA Ranches that professionals cannot square it with reality. For instance, ATA did not provide the actual income or expenses for the Ranches to an appraiser who was conducting a valuation of ATA Ranches in 2022 because the $1.5 million average annual losses incurred would massively devalue the Ranches. Upon information and belief, this same problem occurred when Adelaida was put up for sale, as the prices ATA was charging Adelaida for the grapes was so far below market that it grossly inflated Adelaida's profitability—so much so that Adelaida's financials could not be used as an accurate representation of potential profitability to a prospective buyer.

87.    Upon information and belief, under the new grape transfer arrangement—whereby Adelaida now reimburses ATA Ranches for farming expenses but does not pay for the grapes or any other expenses—Adelaida is now paying far

more per ton than it was paying under the prior agreement. Unsurprisingly, the bargain-basement prices Adelaida was paying under Kedrin's 2016 grape purchase agreement resulted in ATA losing over $1.5 million annually. If ATA had treated Adelaida as a true third party and negotiated at arm's length, as it is required to do, the price for these grapes would be even higher than Adelaida pays under the new agreement (paying farming costs) to ensure that ATA covered all of its expenses and could generate a profit.

88.    Upon information and belief, ATA Ranches receives cash infusions from ATA in order to survive and for "capital improvements" even though it could sell its grapes for a significant profit on the open market and be self-sustaining.

89.    Despite the fact that the 2022 and 2023 viticultural agreements between ATA Ranches and Adelaida state that Adelaida "will pay, and where required, reimburse Grower for all costs associated with the farming of the Vineyard," upon information and belief, Defendants caused ATA to pay for costs associated with farming the vineyards located on the Ranches.

90.    ATAR grape farming provides a tremendous benefit for the controlling shareholder Kedrin and Adelaida but is of no benefit to minority shareholders Matthew and Gretchen because the viticultural agreements between ATA Ranches and Adelaida gift all of the valuable premium grapes to Adelaida in exchange for Adelaida merely reimbursing ATAR for the farming costs.

91.    In reality, the services and grapes that Adelaida and KMBG receive are constructive dividends from ATA and SDI to Kedrin. Plaintiffs' Trusts do not receive the same constructive dividends because Matthew's Trusts hold only a fractional percentage of KMBG, and Gretchen's Trusts have no ownership interest in KMBG, whereas Kedrin holds the majority of KMBG.

92.    It is difficult to fathom how Adelaida, which has routinely been forced to borrow money for at least the past seven years and had debt it owed to ATA written off, suddenly has sufficient cashflow to pay far more than what it was paying for

grapes under the prior grape purchase agreement. Moreover, ATA/SDI have reported a sudden, significant, unexplained drop in their cash balances. Thus, it is likely that ATA and/or SDI are either directly or indirectly financially supporting and/or using accounting maneuvers to shoulder or lessen Adelaida's farming costs.

93.    On August 1, 2024, Matthew sent a Section 1601 corporate records request to ATA for corporate records related to the Ranching Operations and Related Party Transactions for years 2022 and 2023. ATA refused to respond.

**E.    Defendants' Attempt to Sell ATA Ranches to Create an Indemnification Slush Fund to Benefit Kedrin**

94.    On or about November 11, 2021, ATA entered into an agreement with Zepponi & Company ("Zepponi") to sell the Ranches. Neither Kedrin nor any of the other Defendants told Matthew and Gretchen that the Ranches were put up for sale. Upon information and belief, KMBG entered into a similar agreement with Zepponi to market and sell properties owned by KMBG, including Adelaida. Zepponi marketed the Ranches, as well as those assets owned by KMBG, beginning in November 2021.

95.    On March 11, 2023, ATA's General Counsel, Defendant Carter, sent the minority shareholders an email informing him that ATA was calling a special board of directors meeting the next day to:

       a.    consider and approve a letter of intent, "including the $22,500,000 purchase price for ATAR's real property assets";

       b.    authorize ATA senior management to negotiate a definitive purchase and sale agreement with a preselected buyer, Mount Paso LLC; and

       c.    authorize ATA senior management to perform all acts necessary to finalize the sale of ATAR's real property assets.

96.    The March 12 Special Meeting Binder informed Plaintiffs that after several rounds of discussions with purchaser Mount Paso, an LOI was agreed to in principle with the following key terms:

*COMPLAINT*

a.    $22,500,000 for ATAR's real property assets;

b.    2023 grape crop stays with ATAR;

c.    120-day diligence period + 30 days to close;

d.    buyer takes over the task and expense of the search for water; and

e.    PSA to be negotiated over the next 30 days.

97.    The March 12 Special Meeting Binder disclosed for the first time to Plaintiffs that: (i) Zepponi had conducted an appraisal that valued ATAR's ranch properties between $27,500,000 and $35,200,000, as of June 13, 2022; and (ii) Zepponi had received "two verbal offers" prior to receiving the current offer from Mount Paso. The first potential purchaser offered $35 million to buy all assets of ATAR and KMBG. The second potential purchaser made an offer of $31 million for the same properties with a $7 million payout contingent on a groundwater threshold. Both were "all in" offers for all real and personal property held by ATAR and KMBG, including brands, goodwill, equipment, inventory, and crops.

98.    On March 12, 2023, the ATA Board held a special meeting and voted to approve entering into the LOI with Mount Paso to sell the Ranches. Per the meeting minutes, after voting to approve the LOI, Defendant Pierce agreed to reach out to the other Class A shareholder, Brett, as well as the Class B shareholders, Matthew and Gretchen, to offer "a more detailed briefing."

99.    While ATA did offer to have a phone call with Plaintiffs and the other shareholders to answer questions regarding the transaction, it did so after the Board meeting had already occurred and the Board had voted to approve the LOI and begin finalizing the sale. In other words, Kedrin was the only shareholder allowed to voice her opinion on the transaction before the Board rubber stamped it. Even Brett, a Class A shareholder, was excluded from providing input about this decision prior to Defendants approving it.

100.    On March 13, 2023, Defendants Pierce and Carter held a virtual Microsoft Teams meeting with Matthew, Jon Marsh (Gretchen's husband and

24

*COMPLAINT*

representative for the call) and Brett to discuss the transaction that the Board had already approved. When asked about the other offers that exceeded $30 million, Pierce and Carter stated that they chose not to follow up because they did not believe they were serious offers. In fact, Pierce and Carter told Plaintiff that the "offers were not worth the paper they were **not** written on." When pressed on why they would not at least try to negotiate further when the offers exceeded $30 million, Defendants stated that they believed these buyers would negotiate the deal down further as due diligence proceeded, even though there was no firm evidence that this would in fact happen.

101. Critically, during the March 13 Teams meeting, Defendant Pierce also indicated that the $21+ million in proceeds from the sale would not be given to ATA's shareholders, as one would expect, but rather ATA intends to retain this cash for "litigation needs." However, the 2020 Shareholder Litigation is a shareholder derivative suit; thus, ATA is not responsible for paying the judgment, but will receive money from Kedrin, its directors, officers, and Adelaida for breaching their fiduciary duties and/or aiding and abetting those breaches to ATA. Nor does ATA have to reserve for its litigation expenses, as, upon information and belief, ATA and SDI's insurance policies provide coverage for damages and legal fees incurred on behalf of Kedrin and the officers and directors at that time. Thus, Defendants' purported reason for keeping the funds is simply fallacious.

102. The only reason to retain the proceeds of the sale, rather than distributing the proceeds to the shareholders as a dividend as would be expected, is to indemnify the directors, officers, and controlling shareholder for their illicit activities. The defendants in the 2020 Shareholder Litigation (Kedrin and the directors and officers of ATA during the relevant time period) were sued because they caused ATA and SDI to enter into and rubberstamped deals for the benefit of the controlling shareholder at the expense of the minority shareholders. The verdict against these defendants is based upon a finding by the jury that they did not act in good faith or in a manner reasonably

believed to be in the best interests of ATA and SDI. ATA, SDI, and their minority shareholders should therefore not be made to ultimately pay for the misdeeds of its fiduciaries.

103.    Defendants' desire to create a slush fund for their own liability sheds light on the true motivation for why Defendants attempted to sell the Ranches at a price much lower than two other offers presented and ATA's own appraisals—unsurprisingly, it's more self-dealing. ATA kept these properties for years despite dumping well over $13 million into the property and losing on average $1.5 million per year. This sudden reversal of course and decision to sell the properties for millions less than their own appraisals in a significantly tougher real estate market only makes sense when put into the context of what the proceeds are being used for—to further Defendants' own self-interests, and not the interests of ATA and its shareholders.

104.    During the March 13 Teams meeting, Defendant Pierce refused to answer any questions about the sale of Adelaida. While Pierce and Carter provided some information about the sale of the Ranches, the call raised many more questions than it answered.

105.    Because ATA was not forthcoming with the critical details about the sales and prior offers, on March 15, 2023, Matthew sent a written corporate records request to ATA seeking documents and information that would answer the open questions Matthew had. ATA's response, however, through its attorneys, was to regurgitate the same information it had previously provided.

106.    If there was any doubt about Defendants' intention to indemnify themselves for their transgressions against the companies and Plaintiffs, any doubt has been removed. In 2023, Matthew followed up with additional questions and requests for records in an attempt to gain some clarity on whether Defendants were planning to reserve funds from a sale or use company assets to indemnify themselves in the event of a judgment against them, but Defendants refused to fully disclose the documents and information surrounding the potential sale of Adelaida and other KMBG assets.

107.   Even after the jury's verdict and $21 million judgment against the defendants in the 2020 Shareholder Litigation, Defendants still refuse to answer any questions about whether they are seeking to have the companies cover the verdicts, pay defense costs, or pay for or pledge company assets to obtain a bond for an appeal. On August 8, 2024, Plaintiffs sent a request for this information to the companies, only to receive a letter from Defendant Shedd stating that it was "premature" to discuss any of these issues claiming the "time for the filing of such an appeal will not run for quite some time." Clearly, with a judgment entered and high-priced attorneys retained for an appeal, Defendants have already discussed and made decisions about the usage of company funds, thus the "premature" excuse for not providing information was clearly not made in good faith. True and correct copies of Matthew Umhofer's August 8, 2024, letter to ATA/SDI counsel and Defendant Shedd's August 21, 2024 response are attached respectively as Exhibits 3 and 4.

108.   Defendants' refusal to provide information is particularly troubling because whether to divert more money to Defendants Kedrin, Pierce, Carter, Duggan and their cohorts should be a very easy decision for the Board to make. Under California law, a director is not entitled to indemnification "In respect of any claim, issue or matter as to which the person shall have been adjudged to be liable to the corporation in the performance of that person's duty to the corporation and its shareholders." Cal. Corp. Code § 317. Here, all of the 2020 Shareholder Litigation defendants were adjudged liable to the corporation for breaching their fiduciary duties to ATA and SDI.

**F.    Defendants' Continuing Misconduct Following a Unanimous Jury Verdict**

109.   On July 10, 2024, a jury in the 2020 Shareholder Litigation unanimously found Defendants Kedrin Van Steenwyk, Pamela Pierce, Joseph McCoy, Daniel Carter, and Kieran Duggan liable to ATA, SDI, and Matthew for breaches of fiduciary duty in an amount exceeding $21 million. The jury's verdict confirmed that the directors and officers implicated in these breaches are unfit to serve in their fiduciary

*COMPLAINT*

capacities, and their continued presence poses a significant risk to the future of both ATA and SDI.

110.    Despite having been found liable for breaches of fiduciary duty, no action has been taken to remove Defendants Kedrin, Pierce, Carter, and Duggan from their respective positions within the companies.

111.    Despite Defendants Kedrin, Pierce, Carter, and Duggan having been found liable for breaches of fiduciary duty, the companies have taken no adverse action against them.

112.    Following the verdict in the 2020 Shareholder Litigation, upon information and belief, Defendants Shedd, Orr, Thomson, Thornock, and Kerr retained Proskauer Rose LLP ("Proskauer") as counsel for Pamela Pierce, Joseph McCoy, Phillip Gobe, and Gene Durocher, directors in the prior federal action. Upon information and belief, Defendants authorized the use of ATA and SDI funds to retain Proskauer. Upon information and belief, at least five (5) Proskauer attorneys represent the directors, three of which are partners. Upon information and belief, Proskauer charges rates in excess of $1,500 per hour for its partners, an amount far higher than the billing rate for trial counsel. The use of ATA and SDI funds to retain Proskauer, fund or guarantee a bond for the appeal, and indemnify any defendant for the judgment against them or the cost of defense of the lawsuit for directors who have been found individually liable for breaches of fiduciary duty against those companies provides no benefit to either ATA or SDI and is a waste of corporate assets.

113.    Upon information and belief, in deciding to have ATA and SDI fund the appeal of the jury's verdict in the 2020 Shareholder Litigation, Defendants Shedd, Orr, Thomson, Thornock, and Kerr are not independent and are acting at the direction of the controlling shareholder, Kedrin. The authorization or use of funds for these purposes is unethical, illicit, and completely antithetical to the directors' fiduciary duties owed to the shareholders.

*COMPLAINT*

114.   Considering Defendants' prior history of self-dealing, the obfuscation regarding other offers to purchase ATA Ranches, the LOI with Mount Paso that was millions below other offers and appraisals of the property, ATA's intention to unnecessarily withhold proceeds of the sale to indemnify Defendants' wrongdoing, Defendants' refusal to remove those found liable of breaches of fiduciary duty from holding positions within ATA and SDI, Defendants' continued subsidization of Adelaida, and Defendants' use of company funds to pay for litigation counsel for wrongdoers in the 2020 Shareholder Litigation, Plaintiff has been forced to litigate this matter.

**G.    Matthew's Right to Information and Participation Under the 2011 Settlement and Shareholders' Agreements**

115.   In 2009, Matthew filed an action against SDI, ATA, and certain of their officers and directors in Harris County, Texas, *Matthew Van Steenwyk, et al. v. Scientific Drilling International, Inc., et al.*, Cause No. 2009-28535 (the "Initial Texas Litigation"), for breach of fiduciary and statutory duties, as well as shareholder oppression. Gretchen was not a party to the Initial Texas Litigation.

116.   In resolving the Initial Texas Litigation, the parties entered into a Settlement Agreement, dated January 24, 2011, and a Shareholders' Agreement, dated October 20, 2011.[1]

117.   The Settlement Agreement and the 2011 Shareholders' Agreement contain provisions regarding the rights of Class A and Class B Shareholders to receive information regarding board meetings and vote on corporate matters.

118.   Section 4(c) of the Shareholder Agreement provides that:

*After the relevant Board has considered and recommended a vote to approve a Fundamental Business Transaction, the relevant Board shall deliver written notice to its shareholders calling a special meeting for the purpose of considering such Fundamental Business Transaction, which notice shall include a written explanation and financial analysis*

[1] ATA Ranches is a third-party beneficiary of both the Settlement Agreement and the Shareholders' Agreement, and is therefore, bound by their terms.

29

*COMPLAINT*

*of the proposed Fundamental Business Transaction. Such notice shall be delivered at least 20 days, but in no event more than 60 days, prior to such meeting. The shareholders shall, acting as a single class, be entitled to vote on such Fundamental Business Transaction. Any such proposed Fundamental Business Transaction shall require the approval of the holders of at least 66 2/3% of the outstanding Common Stock, acting as a single class, of SDI and/or ATA, as the case may be. Except as set forth in this Section 4(c) and as provided for under the Texas Business Organizations Code (as to SDI) and the California General Corporation Law (as to ATA), the Class B Shareholders shall not be entitled to vote on any other matter on which the holder(s) of Class A Shareholders are entitled to vote.*

119.    The Shareholders' Agreement defines a "Fundamental Business Transaction" with respect to either Corporation as: (i) a merger; (ii) an interest exchange; (iii) a conversion; or (iv) sale of all or substantially all of such Corporation's assets; provided, however, that a Fundamental Business Transaction shall not mean any of the foregoing with respect to ATA's Non-Oilfield Business.

120.    The Shareholders' Agreement defines "Non-Oilfield Business" as "businesses and assets of ATA other than ATA's business of designing, building, and manufacturing oil industry technology products, including borehole surveying instruments (both gyroscopic and magnetic), MWD (measurement while drilling) systems, and production logging systems, and selling it to SDI to provide such services as borehole surveying, wireline steering, MWD, production logging services to the oil industry."

121.    Defendants have used these provisions limiting the voting rights of Class B shareholders as a justification to deny Plaintiffs access to information regarding their self-dealing transactions between ATA Ranches and Adelaida and the possible sale of ATA Ranches.

122.    However, neither the Settlement Agreement nor the Shareholders' Agreement provide limitations on Class B shareholders other than **voting on fundamental business transactions** (e.g., merger, sale of assets, etc.) pertaining to **ATA's non-oilfield business**. Plaintiffs remain shareholders and are entitled to information regarding those transactions.

123.   Further, Section 5 of the Shareholders' Agreement requires ATA to deliver to the Receiving Class B Shareholder:

   (a)    copies of all written materials provided to the Boards in preparation for any meeting of the Boards, at the same time as delivered to the members of the Boards, and for regularly scheduled meetings, in no event later than four days before the date of the meeting; and

   (b)    copies of all approved minutes of the Boards within a reasonable period (and in no event more than three business days) after approval thereof by the Boards.

124.   Plaintiffs' right to receive, in advance, board meeting materials and board meeting minutes contains no limitation with respect to ATA's Non-Oilfield Business. Plaintiffs are entitled to **all** of these materials without request and within the time limits set by the Shareholder Agreement.

125.   Defendants have failed to provide the materials as required under Section 5 of the Shareholders' Agreement. For example, Plaintiffs have not received the minutes of a board meeting held on August 20, 2021, minutes of a special board meeting held on October 27, 2021, and materials for a board meeting held on November 12, 2021. Additionally, Plaintiffs have not received board meeting materials or minutes for ATA Ranches.

## FIRST CAUSE OF ACTION

### DIRECT CLAIM FOR BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER

126.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

127.   Defendant Kedrin, the controlling shareholder of ATA, owes fiduciary duties to Plaintiffs and their trusts. Kedrin is required to act with the highest obligations of good faith, loyalty, fair dealing, due care, and candor. These duties

require her to refrain from abusing her position of control over ATA to benefit herself or another entity in which she owns substantial interests, like Adelaida and KMBG, at the expense of the minority shareholders.

128.    As set forth above, Kedrin has breached her fiduciary duties to ATA's minority shareholders by authorizing payments to herself of constructive dividends in the form of financial gifts and subsidies from ATA and SDI to support her individual interest in KMBG/Adelaida, and preventing ATA from issuing dividends to Plaintiffs and their trusts, Kedrin has breached her fiduciary duties to Plaintiffs and their trusts.

129.    As a result of Kedrin's breaches of her fiduciary duties, Plaintiffs and their trusts have sustained and will continue to sustain damages and injuries including, but not limited to, unpaid dividends from ATA.

130.    These damages are unique to Plaintiffs and their trusts and are not incidental to the damages done by Kedrin to ATA, SDI, and ATA Ranches as a whole. The amount of damages will be determined according to proof at trial.

131.    In engaging in the actions and conduct alleged above, Defendant Kedrin acted with recklessness, oppression, fraud, and malice. Plaintiffs and their trusts are, therefore, entitled to an award of punitive damages against Kedrin.

## SECOND CAUSE OF ACTION

### DIRECT CLAIM FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTY BY CONTROLLING SHAREHOLDER

132.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

133.    As described above, D&O Defendants and Adelaida possessed actual knowledge that Kedrin owed fiduciary duties to ATA's minority shareholders, including Plaintiff and the trusts he represents. Adelaida knew of those fiduciary duties through its CEO (Kedrin), its directors (Carter and Kedrin's stepson, Duggan), and other members of Adelaida's management.

134.   By taking constructive dividends in the form of financial gifts and subsidies from ATA and SDI to support her individual interest in Adelaida and preventing ATA and SDI from issuing dividends to Plaintiffs and their trusts, Kedrin breached her fiduciary duties to Plaintiffs and their trusts.

135.   D&O Defendants and Adelaida possessed actual knowledge that Kedrin owed fiduciary duties to Plaintiff and breached her fiduciary duties to Plaintiffs and their Trusts.

136.   D&O Defendants and Adelaida gave substantial assistance and/or encouragement to Kedrin in paying constructive dividends in violation of her fiduciary duties. The conduct of D&O Defendants and Adelaida is described above. D&O Defendants and Adelaida substantially assisted and/or encouraged Kedrin by failing to take action to prohibit the serial breaches of fiduciary duty by the controlling shareholder, also detailed above.

137.   D&O Defendants and Adelaida's conduct in aiding and abetting Kedrin was a substantial factor in causing Plaintiffs to sustain unique damages and injuries including, but not limited to, unpaid dividends from ATA and SDI. Those amounts will be determined according to proof at trial.

138.   In engaging in the actions and conduct alleged above, said Defendants acted with recklessness, oppression, fraud, and malice. Plaintiffs and their trusts are, therefore, entitled to an award of punitive damages against said Defendants.

## THIRD CAUSE OF ACTION

## BREACH OF CONTRACT

139.   Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

140.   An actual controversy has arisen between Matthew and Defendants as to Matthew's legal rights and duties under the 2011 Settlement Agreement and Shareholders' Agreement, as Defendants have either failed to provide the materials

and minutes or provide them within the timeframe as is mandated by these agreements.

141.    Matthew has been damaged as a result of Defendants' breach.

142.    Matthew seeks declaratory relief adopting each and every allegation of his as set forth above, regarding his rights to receive materials and minutes from every board meeting under the 2011 Settlement Agreement and Shareholders' Agreement, and mandatory injunctive relief directing Defendants to comply with their contractual obligations.

## FOURTH CAUSE OF ACTION

### DIRECT CLAIM FOR ORDER COMPELLING PRODUCTION OF CORPORATE RECORDS

143.    Plaintiffs incorporate by reference the allegations set forth above as though fully restated herein.

144.    Matthew made a written request for an inspection of corporate records and information to ATA on March 15, 2023, as is permitted under California Corporations Code section 1601.

145.    In response to the request dated March 15, 2023, ATA produced some of the requested ATA corporate information about the sale of the Ranches, but not all the requested information. ATA produced no information about the intent to indemnify defendants named in the 2020 Shareholder Litigation.

146.    Matthew made follow-up written requests for ATA corporate information on March 28, 2023, and again on April 26, 2023, to ATA's counsel, providing supporting legal authority for his valid request. Plaintiffs' counsel also met and conferred telephonically with ATA's counsel in an attempt to avoid litigation about this issue. However, despite Plaintiffs' efforts, D&O Defendants again failed to produce all the ATA corporate information requested by Matthew. The information

sought by Matthew was and is necessary to investigate the wrongdoing as described in this complaint.

147.    Matthew made a written request for an inspection of corporate records and information to ATA on August 1, 2024, as is permitted under California Corporations Code section 1601.

148.    ATA produced no information regarding Ranching Operations and Related Party Transactions in response to the 1601 request dated August 1, 2024, and refused to even respond.

149.    Plaintiffs are informed and believe that D&O Defendants' response to Matthew's demand for corporate information, or lack thereof, was coordinated and orchestrated by Defendants Kedrin, Carter, Pierce, McCoy, Duggan, Shedd, Orr, Thomson, Thornock, and Kerr.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment against Defendants as follows:

1.    A declaration that D&O Defendants have breached and/or aided and abetted the breach of their fiduciary duties to ATA, SDI, and ATA Ranches;

2.    A determination and award to Plaintiffs of damages sustained by them as a result of the violations set forth above from each of Defendants, jointly and severally, together with interest thereon;

3.    Directing ATA, SDI, ATA Ranches, and D&O Defendants to take all necessary actions to reform and improve their corporate governance and internal procedures to comply with applicable laws and to protect ATA, SDI, ATA Ranches, and their shareholders from a repeat of the damaging events described herein, including, but not limited to, removing directors and officers engaged in wrongdoing, and putting forward for shareholder vote resolutions for appropriate amendments to ATA's, SDI's, and ATA Ranches' Bylaws or Articles of Incorporation;

4.    Enjoining Defendants from engaging in ongoing conduct that constitutes breaches of their fiduciary duties, corporate waste and conversion;

*COMPLAINT*

5.      Determining and awarding to ATA, SDI, and ATA Ranches exemplary damages against Defendants in an amount necessary to punish Defendants, including but not limited to Kedrin, and to make an example of said Defendants to the community;

6.      Attaching, impounding, imposing a constructive trust on or otherwise restricting Defendants' assets so as to assure that Plaintiffs have an effective remedy;

7.      A declaration that the controlling shareholder Kedrin, breached her fiduciary duties to the minority shareholders by paying herself constructive dividends and preventing dividends from being paid to Plaintiff's Trusts, and awarding damages for those breaches;

8.      A declaration that D&O Defendants and Adelaida aided and abetted Kedrin in her breach of fiduciary duties;

9.      A declaration that D&O Defendants, Kedrin, and Adelaida are liable under the common law of unjust enrichment;

10.     Temporary, preliminary and permanent injunctive relief enjoining and restraining Defendants from reserving or using any ATA, SDI, or ATA Ranches funds for the indemnification of defendants named in the 2020 Shareholder Litigation;

11.     Appointment of a receiver that has complete control over ATA's ranching operations and assets;

12.     A declaration that under the 2011 Settlement Agreement and Shareholders' Agreement, Matthew is entitled to receive all Board Meeting materials and minutes, including information related to ATA's Non-Oilfield Business;

13.     A mandatory injunction compelling D&O Defendants to provide all Board Meeting materials and minutes that have not been provided and all future materials in a timely fashion to Matthew as is mandated under the Shareholders' Agreement without any exclusion as to Non-Oilfield Business information;

14.     An order compelling the production of requested corporate records and information from ATA, ATA Ranches, and D&O Defendants;

*COMPLAINT*

15.     An award of nominal damages;

16.     An award of punitive and exemplary damages;

17.     An award of costs and disbursements incurred in this action, including reasonable attorneys' fees, accountants' fees and expert witness fees, costs and expenses;

18.     Lawful interest according to proof at the time of trial; and

19.     Any such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury of all issues which are subject to adjudication by a trier of fact.

Dated: August 29, 2024          **UMHOFER, MITCHELL & KING LLP**

_/s/ Matthew Donald Umhofer_
Matthew Donald Umhofer, Esq.
J. Anthony King, Esq.
Diane H. Bang, Esq.
_Attorneys for Plaintiffs_

_COMPLAINT_

**VERIFICATION**

I, Matthew Donald Van Steenwyk, verify that I am a shareholder of ATA, SDI, and ATA Ranches. I have reviewed the allegations in this Verified Shareholder Complaint. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on 28 Aug 2024.

_____
Matthew Donald Van Steenwyk

**VERIFICATION**

I, Gretchen Marie Van Steenwyk-Marsh, verify that I am a shareholder of ATA, SDI, and ATA Ranches. I have reviewed the allegations in this Verified Shareholder Complaint. As to those allegations of which I have personal knowledge, I believe them to be true; as to those allegations of which I lack personal knowledge, I rely upon my counsel and counsel's investigation, and believe them to be true. Having received a copy of the complaint and reviewed it with counsel, I authorize its filing.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on 28 Aug 2024.

_____
Gretchen Marie Van Steenwyk-Marsh